UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

ROBERT WALSH,

                    Plaintiff,                    04 Civ. 9539

    -against-                                     OPINION

THE CITY OF NEW YORK and
MICHAEL SILVESTRI,

                    Defendants.

------------------------------------X

A P P E A R A N C E S:

                Attorneys for Plaintiff

                BRODER & REITER
                350 Fifth Avenue, Suite 2811
                New York, NY  10118
                By:  Glenn A. Herman, Esq.


                Attorneys for Defendant

                CORPORATION COUNSEL OF THE CITY OF NEW YORK
                100 Church Street, 4th Floor
                New York, NY  10007
                By:  Cathy Neustein, Esq.

**Sweet, D.J.**

The defendant, the City of New York (the "City"),
has moved under Rule 56, Fed. R. Civ. P., for summary
judgment dismissing the complaint of plaintiff, Robert
Walsh ("Walsh" or the "Plaintiff"), a firefighter alleging
claims of common law negligence, battery, negligent hiring,
supervision and retention, and violation of General
Municipal Law ("GML") § 205-a, resulting from injuries
suffered in a fight in the firehouse to which he was
assigned.  Walsh has cross-moved for partial summary
judgment under Rule 56, Fed. R. Civ. P., on the issue of
liability.  The City has cross-moved, seeking summary
judgment dismissing the complaint as a matter of law on the
grounds of non-liability.

The motion and cross-motion of the City is
granted in part and denied in part and the cross-motion of
Walsh is granted in part and denied in part.

A welter of unfortunate facts set forth below
have been established by this record, including the
consumption of alcohol in the firehouse, a fight, serious
injuries suffered by Walsh when hit by a steel chair

wielded by defendant Michael Silvestri ("Silvestri"), a
fellow firefighter, and a cover-up, an investigation of
which was conducted and reported upon to Mayor Michael R.
Bloomberg and Fire Commissioner Nicholas Scoppetta. Out of
those facts, Walsh has urged a number of theories of
liability, one of which, negligent supervision of
Silvestri, has been established.

## Prior Proceedings

On December 6, 2004, Walsh filed his diversity
complaint against the City and Silvestri. His amended
complaint, filed on February 21, 2007, alleges four
alternate common-law negligence claims against the
defendant City: (1) vicarious liability, as Silvestri's
employer, for Silvestri's assault under the doctrine of
respondeat superior; (2) failing to provide Walsh with a
safe place to work; (3) negligent supervision of Silvestri,
and (4) negligent hiring, supervision and retention of
Captain Terence Sweeney ("Captain Sweeney") and Lt. Greg
McFarland ("Lt. McFarland"). Walsh has also alleged
violations of GML § 205-a, based upon Defendants' failure
to comply with Labor Law § 27-a and Fire Department
regulations.

3

Discovery proceeded and on January 22, 2007, the
City served a motion for summary judgment and supporting
papers. On February 13, 2007, Walsh filed a cross-motion
for summary judgment. On February 21, 2007, Walsh filed an
amended complaint. On May 4, 2007, Walsh filed a motion
for summary judgment on liability, as well as a
supplemental attorney's affidavit and an expert affidavit.
On July 25, 2007, the City filed a cross-motion for summary
judgment. The motions were marked fully submitted on
August 22, 2007. On May 31, 2006, a default judgment was
entered against Silvestri for failure to respond to the
complaint.

**The Facts**

The facts set forth below emerge from the
parties' Local Rule 56.1 Statements and Counterstatements,
a report to Mayor Michael R. Bloomberg and Fire
Commissioner Nicholas Scoppetta submitted by Department of
Investigation Commissioner Rose Gill Hearn on March 24,
2004 (the "DOI Report"), and the affidavits of counsel and
supporting exhibits. Because of the nature of these events

and the thorough discovery by counsel, there is no dispute
as to the following facts.

On December 31, 2003, the New York City Fire
Department ("FDNY") firehouse located at 7219 Amboy Road,
Staten Island ("the Firehouse"), housed Engine Company No.
151 ("Engine 151") and Ladder Company No. 76 ("Ladder 76").

Walsh, a resident of New Jersey when this action
was commenced, joined the FDNY in 1995. He was assigned to
Ladder 76 in 1998 and his rank at the time of the incident
was Firefighter First Grade.

Captain Sweeney was employed by the FDNY in 1978.
He was promoted to the rank of Captain in 1997 and was
assigned to Ladder 76 in January 2000.

Silvestri had worked for FDNY for over fifteen
years at the time of the incident and was assigned to
Engine 151 in September 2002. He held the rank of
Firefighter First Grade. The DOI Report contained no
evidence of prior disciplinary incidents involving
Silvestri.

5

Lt. Raymond Kane ("Lt. Kane") began his employment with the FDNY in 1988. He was assigned to Ladder 76 in October 2001.

Lt. McFarland had been employed by FDNY for twenty-five years at the time of the incident. He was a covering lieutenant at Engine 151.

Joseph Spitalieri ("Spitalieri") joined the FDNY in 1999. He was assigned to Ladder 76 in 2002.

David Johnsen ("Johnsen") joined the FDNY in 1985. He was assigned to Engine 151 in 1990.

Salvatore Velez ("Velez") joined the FDNY in 1987. He was assigned to Engine 151 in 1990.

Robert Gibson ("Gibson") was with the FDNY for thirty-seven years at the time of the incident. He had been assigned to Battalion 23 since 1995 and held the rank of Battalion Chief.

Louis Rotundo ("Rotundo") was employed by the FDNY for twenty years at the time of the incident. He was assigned to Engine 162 in 1985.

Richard Fritz ("Fritz") had been employed by the FDNY for twenty-one years. He was assigned to Ladder 82 in 1998. Fritz knew Silvestri when Fritz was assigned to Ladder 82 and Silvestri was assigned to Engine 162, as the two companies shared a kitchen.

Prior to December 31, 2003, beer and other alcoholic beverages were regularly present and consumed on the premises by the members of the Firehouse.

Captain Sweeney, Lt. Kane and Lt. McFarland, the three fire officers present at the time of the assault on the evening of December 31, 2003, were aware of the possession, use, and consumption of alcoholic beverages by on-duty members of the Firehouse.

Captain Sweeney had two prior convictions for alcohol related offenses during his employment with the Fire Department, as well as a third arrest for assault and reckless endangerment.

7

Lt. McFarland had three prior arrests, one of which was the subject of a departmental disciplinary proceeding. After a departmental trial, Lt. McFarland was found guilty on charges of sexual harassment and being drunk while on duty.

Lt. McFarland was thereafter arrested on Staten Island for assault and reckless endangerment, but proceedings were adjourned in contemplation of dismissal. Subsequently, he was promoted to Lieutenant.

Lt. Kane had not been disciplined by the Fire Department prior to the night of the assault.

Captain Sweeney, Lt. Kane, and Lt. McFarland were aware that New York City Fire Department Regulations prohibited fire department members from consuming alcoholic beverages on Firehouse premises when in uniform or when on duty.

Prior to December 31, 2003, a beverage cooler was kept in the courtyard of the subject Firehouse and was used for the storage of beer for consumption by members of the Firehouse on the Firehouse premises. In order to conceal

the fact that beer was being brought into and consumed at the Firehouse, cans of beer were put into dark-colored, opaque plastic garbage bags and taken into the courtyard. The beer was not consumed from the cans but was instead poured into large plastic cups.

On December 31, 2003, both Captain Sweeney and Walsh were scheduled to work a tour of duty that began at approximately 9:00 a.m. and concluded at approximately 6:00 p.m.

At approximately 4:25 p.m., members of Ladder Company 76, including Captain Sweeney and Walsh, as well as members of Engine Company 151, returned to the Firehouse from a fire run.

After the Firehouse members returned from the fire run, Captain Sweeney gave Walsh cash and directed him to leave the Firehouse to purchase beer at a nearby market. Walsh returned to the Firehouse with approximately 30 cans of beer, which he put in the cooler in the courtyard.

Lt. Kane arrived at the Firehouse at approximately 5:00 p.m. - 5:15 p.m., as he was scheduled to relieve Captain Sweeney of command of Ladder Company 76 at 6:00 p.m. At that time, he was advised by Captain Sweeney that there was beer in the Firehouse.

Lt. Kane declined Captain Sweeney's offer of beer and instead showed Captain Sweeney that he had a bottle of Bailey's Irish Cream liquor, poured himself a shot, and offered one to Captain Sweeney, who declined, since he was drinking beer. Therefore, Lt. Kane took command of the Firehouse knowing that there was beer on the premises and took no action regarding its presence.

At approximately 5:45 p.m., members of the Firehouse, including Walsh, Captain Sweeney, Spitalieri, and Johnsen, were sitting at the kitchen table in the Firehouse. Captain Sweeney drank three or four cups of beer from a plastic cup while in the Firehouse kitchen.

No challenge has been made to the following account of the assault on Walsh, which is contained in the DOI Report:

10

## The Assault on Walsh

On December 31, 2003, between 5:00 pm and 6:00 pm, the firefighters of Engine 151 and Ladder 76 were scattered around the Firehouse—some were cleaning and inspecting the trucks, some were showering, others were watching television or exercising in the gym. At about 5:45 pm, Walsh, Sweeney, Spitalieri and Johnsen were sitting at the kitchen table talking. (Spitalieri was off-duty that day but had arrived at the Firehouse because he mistakenly thought he was scheduled to work the 6:00 pm tour). Other firefighters, including Steven Richards and Michael O'Shea, dropped in and out of the kitchen. Sweeney admitted that he and Walsh were drinking beer in the kitchen/dining area as that time. Walsh was still on duty until his relief arrived to replace him. According to Sweeney, at one point, Silvestri entered the kitchen, spoke to the others a bit and began to mix sangria using a pot and wooden spoon.[1] As previously mentioned, Sweeney stated various firefighters, who he asserted he could not identify, were drinking beverages from the plastic cups. However, Sweeney informed investigators that when he grabbed his last beer from the garbage bag in the courtyard, he noticed that many of the 30 cans of beer had been consumed and the empty cans were in the garbage bag.

Spitalieri admitted to being at the table in the kitchen with Sweeney, Walsh and Johnsen prior to the assault. But Spitalieri also stated he knew, saw and heard nothing about beer in the kitchen, courtyard or being consumed by anyone. He stated that he did see Sweeney and Walsh drinking from plastic cups. Spitalieri also stated he knows nothing about there being sangria at the Firehouse. Spitalieri indicated that while he was seated at the kitchen table prior to the assault, he did see Silvestri in the kitchen sink area, but he said he could not specify what Silvestri was doing because Walsh was blocking his view.

---

[1] Sweeney asserted that he did not know that [ ] Silvestri was going to make sangria in the Firehouse that afternoon, but he did not stop Silvestri. When asked by investigators why/how a firefighter could feel comfortable making sangria in a Firehouse in front of a captain, Sweeney indicated that he had permitted alcohol at the Firehouse in the past.

(Sweeney stated that is when Silvestri was making the sangria).

According to Kane, when the "change alert" bell sounded around 6:00 pm (indicating the start of the next tour) he came downstairs from the second floor to give the Ladder 76 firefighters their assignments. Kane said he found Walsh in the kitchen and advised him of his assignment.[2] At the time, Kane said he observed Sweeney and Walsh sitting at the kitchen table with "big cups" in front of them. Kane told investigators there were other firefighters in the kitchen/dining area, but he could not remember who they were or if they had been holding the "big cups." Kane said he got a cup of coffee in the kitchen where, according to Sweeney, Silvestri was making the sangria in the pot. Kane told investigators that he remembered seeing Silvestri in the kitchen at this time, but asserted he could not remember what Silvestri was doing. Kane then left the kitchen.

At 6:10 pm, Firefighter Salvatore Velez arrived at the Firehouse and went into the kitchen where he found Spitalieri, Sweeney, Johnsen, Silvestri and Walsh either sitting or standing. Velez claims he did not observe anyone drinking beer or sangria at the time. Around that time, the conversation around the kitchen table turned to Elvis Presley, and Walsh and Silvestri began to argue about the date of Presley's birthday. Sweeney said the argument began around 6:20 pm and that Silvestri did not appear to be intoxicated at the time. As the bickering continued, Walsh and Silvestri began to curse and insult each other. The witnesses interviewed made various statements describing the tone and types of things the two men said to each other as going from jocular to more personally biting. Generally, the witnesses said Silvestri and Walsh were arguing about Silvestri's alleged excessive overtime. Sweeney said at one point in the argument Silvestri called Walsh a "big fag" to which Walsh retorted that Silvestri was "the one who fucked three guys out of overtime."[3] As the argument got louder and more

---

[2] Walsh was still on duty because his relief had not arrived.
[3] Walsh was referring to an incident that had occurred on Thanksgiving of 2003, in which Silvestri had deprived three other firefighters of getting an overtime tour. That incident had become a sore point in the Firehouse.

12

heated, many of the firefighters present stated that they began to feel uncomfortable and left the kitchen, leaving Walsh, Silvestri, Sweeney, Johnsen, Spitalieri and Velez behind.   Silvestri angrily told Walsh he should leave the Firehouse.   Walsh then said, in sum, that he was there working overtime until his relief arrived.

The argument continued for a few moments more and culminated with Silvestri threatening to hit Walsh with a chair.  Walsh responded by saying that he would "pay" to see him do it, but apparently never expected Silvestri was serious about the threat.   As Silvestri began to walk around the table toward Walsh, he picked up a metal chair.  According to Sweeney, Walsh did not even turn in Silvestri's direction.   At that point, someone in the kitchen yelled, "Watch out!"   Johnsen and Sweeney saw Silvestri strike Walsh in the head with a metal chair, knocking him to the floor. Although Spitalieri asserted that his head was turned away at the moment of impact, he said he heard the sound of the chair striking Walsh.   Spitalieri said he turned his head in time to see Walsh fall onto the floor.   Silvestri immediately jumped on top of Walsh and struggled with him on the floor.  Velez, who was in the apparatus area, heard Sweeney yell, "Get off of him!"   Velez ran back into the kitchen and observed Silvestri struggling with Walsh on the floor.   At the same time, Sweeney pushed the table out of the way and jumped over it to pull Silvestri off of Walsh.   Kane had been walking down the stairs when he hard the commotion in the kitchen.  He ran into the kitchen and saw Sweeney pulling Silvestri off of Walsh.   Kane then tried to separate the pile of men by pulling Sweeney off Silvestri, who was on top of Walsh.   Sweeney told investigators everyone in the Firehouse knew within minutes there had been an altercation in the kitchen.

Walsh had a huge gash on his face and was bleeding profusely.  Walsh had no injuries of any kind on his hands, indicating that he likely did not see or attempt to deflect the chair as it came down on him. Silvestri's hands were covered with blood.   Sweeney screamed at Silvestri, "Get your locker packed up, you are out of here!"   Firefighter Richards, who had been in the apparatus room, also heard the commotion and ran into the kitchen.  He grabbed Silvestri and walked

13

him upstairs to the Engine 151 office. Richards said Silvestri was "crying," and asking to see Walsh. By that point, nearly every firefighter in the Firehouse had come to the kitchen, learned Silvestri had struck Walsh with a chair, and saw the state of the kitchen, which had blood and the "plastic cups" everywhere. Shortly thereafter, Velez went to see Silvestri upstairs. Silvestri told Velez that he did not remember hitting Walsh.

It became obvious very quickly that Walsh needed to go to the hospital. Sweeney, Spitalieri and Johnsen told investigators Walsh instructed Sweeney to, "Tell them I fell down the stairs." As Walsh continued to bleed heavily, firefighters looked around the kitchen for absorbent material to stanch the blood flow. Coffee filters from the kitchen were used in a vain attempt to stop the blood pouring from Walsh's face. FF Jeffrey Tkachuk provided Walsh with a pad from his first responder kit. Johnsen went to the second floor to get towels to soak up the blood and informed FF Glen Midbo that Walsh, "got cut." Midbo stated that Kane then ran upstairs and yelled to him, "Grab some towels. Bob is hurt." Midbo then ran downstairs with Kane. When Kane returned to the kitchen, he heard on the firefighters yell, "Someone call EMS!" However, Sweeney said, "Don't get EMS." Kane believed that Sweeney did not want to call EMS because they had been drinking alcohol and had not yet cleaned up the Firehouse. Sweeney confirmed he did not want anyone to call EMS because he feared the alcohol would be discovered. Investigators determined there was an available EMS vehicle a short distance from the Firehouse at that time and it did not respond to any emergency calls that evening.[4]

---

[4] The officers on duty should have immediately contacted Battalion Chief Robert Gibson about the assault and the nature of Walsh's injuries. FDNY Reg. § 30.1.6 provides, that "[r]eports of special importance or of a nature similar to the following shall be preceded by an immediate telephone conversation to the Deputy and Battalion Chief on duty: (A) An unusual occurrence at a fire or elsewhere; and (B) Loss of life or serious injuries to members or civilians at a fire of elsewhere." Under AUC 268A § 3.1, "[t]he following situation requires immediate notifications to the Bureau of Investigations and Trials: 3.1.2 Physical altercations among members." Additionally, under AUC 268A §2.1.1, all FDNY personnel who had knowledge of Silvestri's assault on Walsh were required to contact the Fire Department Inspector General's Office at DOI.

14

At least fifteen firefighters, including three officers (Sweeney, Kane and McFarland), were in the Firehouse when Silvestri assaulted Walsh. A conscious decision was made not to call EMS to assist Walsh. Moreover, no notifications were made to the Fire Department bureaus that could have and should have responded to this matter, such as the Bureau of Health Services, the Safety Battalion, and the Bureau of Investigations and Trials. None of the firefighters called the nearest police precinct.

. . . .

Sweeney ordered Spitalieri to get his (Spitalieri's) car so they could take Walsh to the hospital. Knowing that Sweeney's shift was over and that Sweeney would be leaving the Firehouse to take Walsh to the hospital, Kane said he was panicked by the thought of dealing with FDNY "brass" and reporting Walsh's injury and the alcohol in the Firehouse. He said he asked Sweeney how to handle the situation.

. . . .

At about 6:30 pm, Sweeney, Spitalieri, and Walsh drove to Staten Island University Hospital North ["SIUH"], which is approximately 11 miles from the Firehouse. Spitalieri drove, Sweeney sat in the front passenger's seat, and Walsh was sprawled out in the back seat. Walsh was dazed and in pain but conscious during the car ride.

While they were en route to the hospital, Sweeney used his cell phone to call Kane twice. All three men—Kane, Sweeney and Spitalieri—recall the conversations similarly. In the first call, Kane and Sweeney discussed what they were going to do. Kane asked Sweeney how he should "write this up." According to Kane, Sweeney then "mentioned the stairs."

During the second phone conversation a few minutes later, Sweeney, Kane and Spitalieri assert Walsh said, "You have to cover me, I fell down the stairs." Spitalieri maintains he overheard Sweeney say, "Bobby said he fell, we are going with that." Kane told investigators "I wanted to make sure Captain Sweeney

15

and I were on the same page. Captain Sweeney suggested we say he fell down the stairs, but that it was my decision." Sweeney also informed investigators he told Kane he had to make the decision and that he had to "live by it." Spitalieri also heard Sweeney say to Kane, "It's your career on the line." According to Sweeney, Kane said they would say Walsh fell down the stairs.

Due to the severity of Walsh's injuries, the hospital staff attended to him immediately. Generally, the various SIUH witnesses consistently described the statements that Sweeney, Spitalieri, and Walsh made during the first fifteen to thirty minutes they were at the hospital about the cause of Walsh's injuries. In short, Sweeney and Spitalieri each lied to at least seven different hospital personnel, which included the doctors, nurses and support staff, when they stated Walsh was injured by a fall down the stairs. This fictitious information was contemporaneously recorded in SIUH's records, creating false entries in the business records of the hospital, which is a violation of criminal law.[5] Just before he lost consciousness at the hospital, Walsh also lied about the cause of his injury.

. . . .

Nurse [Joseph] Kelly then asked Walsh what had happened but he did not respond. Kelly repeated the question, and Walsh then said that he did not know, and he then said, "I guess I fell down a flight of stairs." Nurse Kelly again asked Walsh how this had happened so he could assess Walsh's injuries. Once again, Walsh responded by saying, "I fell down the stairs." Sweeney and Spitalieri were holding Walsh up while he made those statements.

. . . .

Soon after Walsh arrived at the hospital, Nurse Joanne Olsen (who was an acquaintance of Sweeney's), replaced Nurse [Joseph] Ferrara as the Charge Nurse in the

---

[5] See NYS Penal Law Section 175.10, Falsifying Business Records in the First Degree.

16

Emergency Department, and a series of physicians began
to treat Walsh.

. . . .

Walsh's condition deteriorated rapidly after he
entered the hospital. Among other things, he had lost
a massive amount of blood and his blood pressure had
elevated to dangerous levels. According to the SIUH
Progress Notes, at 7:15 pm Walsh was "bleeding
profusely from facial wounds," he was given anesthesia
and "[e]lective intubation."[6]   Dr. Anthony Kopatsis,
the Trauma/General Service Surgical doctor, intubated
Walsh in order to protect his airway. He also changed
Walsh's status from a Level Two Trauma patient to a
Level One Trauma patient, which indicates the patient
could die imminently. The hospital reported that, as
a result of the severe blows to his face, Walsh
suffered a left orbital fracture, bilateral jaw
fracture, nose fracture, and a skull fracture.

Sweeney saw Nurse Olsen, his acquaintance, in the
Emergency Room, and asked her to look in on Walsh, who
was then being treated by the trauma team. Olsen
consulted with the staff treating Walsh and came out
to tell Sweeney that Walsh's condition was extremely
serious, he was being placed on a respirator, and that
a coma was to be induced due to the swelling of his
brain. She also told Sweeney that the staff treating
Walsh was skeptical about whether his injuries were
caused by a fall, and that knowing the true cause
might be vital to his treatment. And so for the first
time, Sweeney admitted Walsh was assaulted "with a
steel chair." Spitalieri was present when Sweeney
reported the assault with a metal chair. That was at
approximately 7:15 pm.

(DOI Report at 7-13).

Thereafter, Captain Sweeney notified the

Battalion Chief Robert Gibson that Walsh was assaulted by

---

[6] Intubation is the process by which a tube in inserted down the throat
and into the trachea so breathing can be sustained.

17

Silvestri and that the prior report that Plaintiff fell
down stairs was fabricated. The Police Department was
called, and Silvestri was arrested the following morning.

On March 15, 2006, Silvestri pleaded guilty to
second degree assault and he has served a one year prison
sentence.

## The Summary Judgment Standard

In deciding a motion for summary judgment, a
court shall render judgment "forthwith if the pleadings,
depositions, answers to interrogatories, and admissions on
file, together with the affidavits, if any, show that there
is no genuine issue as to any material fact and that the
moving party is entitled to a judgment as a matter of law."
Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett,
477 U.S. 317, 322-23 (1986); Weinstock v. Columbia Univ.,
224 F.3d 33, 41 (2d Cir. 2000). A material fact is one
that would "affect the outcome of the suit under the
governing law," and a dispute about a genuine issue of
material fact occurs if the evidence is such that "a
reasonable jury could return a verdict for the nonmoving

party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 57 (2d Cir. 1997).

The moving party has the initial burden of showing that there are no material facts in dispute, Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970), and can discharge this burden by demonstrating that there is an absence of evidence to support the nonmoving party's case, Celotex, 477 U.S. at 325. The nonmoving party then must come forward with "specific facts showing that there is a genuine issue for trial," Fed. R. Civ. P. 56(e), as to every element "essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

The court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." Eastway Constr. Corp. v. New York, 762 F.2d 243, 249 (2d Cir. 1985). However, the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249. If there is not, summary judgment is proper. See id. at 249-50.

**The Claim for Late Medical Treatment Has Been Withdrawn**

Walsh has withdrawn his claim for late medical treatment. (Pl. Mem. in Opp. at 48.)

**The Claim for Vicarious Liability Has Not Been Established**

Under New York law, an employer may be held liable for the wrongful acts of an employee only when those acts were committed within the scope of employment. See Vega v. Northland Mktg. Corp., 735 N.Y.S.2d 213, 214 (App. Div. 2001). An employer will not be held liable when "the tort is committed solely for personal motives of the employee unrelated to the furtherance of the employer's business." See Ray v. Metro. Transit Auth., 634 N.Y.S.2d 160, 162 (App. Div. 1995). The relevant test is "whether the act was done while the servant was doing his master's work, no matter how irregularly, or with what disregard of instructions." Ierardi v. Sisco, 119 F.3d 183, 187 (2d Cir. 1997) (quoting Riviello v. Waldron, 47 N.Y.2d 297, 302 (1979) (internal quotations omitted)). In order for an employer to be vicariously liable, the tortious conduct must be a "natural incident" of the employment. Riviello, 47 N.Y.2d at 304.

Here, Silvestri was not acting within the scope

of his employment. His actions, although committed in the

firehouse, were prompted by personal feelings and were not

in furtherance of the City's interests. Therefore, the

City cannot be held vicariously liable under a theory of

respondeat superior.

## The Claim for Negligent Supervision Has Been Established

In Ehrens v. Lutheran Church, 385 F.3d 232 (2d

Cir. 2004), the Second Circuit Court of Appeals set forth

the legal standard applied under New York law to claims of

negligent supervision or retention:

> To state a claim for negligent supervision or
> retention under New York law, in addition to the
> standard elements of negligence, a plaintiff must
> show: (1) that the tort-feasor and the defendant
> were in an employee-employer relationship
> [D'Amico v. Christie, 71 N.Y.2d 76, 87 (1987)]
> (2) that the employer 'knew or should have known
> of the employee's propensity for the conduct
> which caused the injury' prior to the injury's
> occurrence, see Kenneth R. v. Roman Catholic
> Diocese of Brooklyn, [654 N.Y.S.2d 791, 793 (App.
> Div. 1997)]; and (3) that the tort was committed
> on the employer's premises or with the employer's
> chattels, D'Amico, [71 N.Y.2d at 88].

Id. at 235.

Here, there is no dispute that Silvestri and the
City were in an employer-employee relationship and the tort
was committed on the employer's premises with the
employer's chattels.

The critical issue is the second factor
enunciated in Ehrens, whether the Fire Department "knew or
should have known of the employee's propensity for the
conduct which caused the injury" prior to the injury's
occurrence.

The City, relying upon Kenneth R. v. Roman
Catholic Diocese of Brooklyn, 654 N.Y.S.2d 159 (App. Div.
1997), has contended that it was not aware of any
propensity towards violence on the part of Silvestri and
therefore cannot be charged with negligent supervision.  In
Kenneth R., the plaintiffs alleged that a Roman Catholic
priest sexually abused the infant plaintiffs.  The priest
pleaded guilty to sexual abuse in the third degree, conduct
which did not fall within the scope of his employment.  Id.
at 161.  The issue in that case was whether the plaintiffs
had adequately stated a cause of action for negligent
hiring, retention and supervision.  Citing to plaintiffs'
assertions that statements they had made to priests at two

22

churches had put the defendant on notice of the illegal conduct, the court determined that the claims for negligent retention and supervision were sufficient to withstand a motion to dismiss.

Here, Walsh has established that no genuine issue of material fact exists as to whether the City, through its fire officers, knew that fights were a common occurrence.

Captain Sweeney testified:

There was a lot of fights in that firehouse. I was there at my first tour, assigned there, I had to break a fight up the first ten minutes I was there. (Captain Sweeney Dep. at 168.)

During his first year, Captain Sweeney broke up five fights between firefighters. (Captain Sweeney Dep. at 169-170). As found above, Captain Sweeney was present as the altercation between Silvestri and Walsh began, heard Silvestri's threat, had previously stopped altercations in the Firehouse, was a superior officer, and failed to take any action to stop the fight. Moreover, Captain Sweeney testified that after the incident, he became aware that Silvestri had been in two fights prior to his transfer to the Firehouse. Walsh has adduced sufficient record

evidence to state a claim against the City for negligent supervision.

The City has contended that "no amount of supervision at the time of the incident could have prevented the spontaneous outbreak of violence which occurred." (Def. Mem. in Opp. at 7). However, the record establishes that the lack of supervision at the Firehouse led to violence which could have been stopped by appropriate supervision.

Liability against a supervisor may be predicated on the supervisor's failure under the circumstances to use reasonable care to control the acts of the subordinate employee, despite having the authority to do so. See Dowler v. Johnson, 225 N.Y. 39, 42-43 (1918); see also Restatement (Second) of Torts § 317 (1965) (cited in D'Amico, 71 N.Y.2d at 87); Restatement (Third) of Torts § 41 (Proposed Final Draft No. 1, Apr. 6, 2005).

The cases cited by the City to support its contention that the Fire Department was not negligent because the "spontaneous, unanticipated nature of the violence here renders the attack unforeseeable" are not

applicable.  Those cases all deal with unprovoked and
unforeseeable attacks that did not occur through any
negligence on the part of the respective defendants and/or
in which there was no special relationship between the
plaintiff and defendant giving rise to a duty of care.  See
German-Bey v. Nat'l R.R. Passenger Corp., 702 F.2d 54 (2d
Cir. 1983) (finding Amtrak not liable to a passenger
slashed by a fellow passenger who might have boarded the
train in an intoxicated condition, as assailant's peaceable
intoxication upon boarding train did not put Amtrak on
notice of his possible harm to other passengers); Maysonet
v. KFC, Nat'l Mgmt. Co., 906 F.2d 929 (2d Cir. 1990)
(finding restaurant not liable for injury to customer by
panhandler, as the sudden and unexpected criminal act of a
third person was not reasonably foreseeable); Stevens v.
Spec Inc., 637 N.Y.S.2d 979 (App. Div. 1996) (finding
nightclub not liable under premises liability theory for
assault on patron by intoxicated independent contractor, as
nightclub had no duty to protect against extraordinary
occurrence that could not reasonably have been
anticipated); Pulitano v. Suffolk Manor Caterers, Inc., 664
N.Y.S.2d 480, 481 (App. Div. 1997) (affirming dismissal of
complaint against catering hall for failing to prevent
fight between two patrons in the parking lot, as any injury

to the plaintiff resulted from the spontaneous and
unexpected criminal act of a third party and "there was no
proof that the defendant's employees were aware of any
situation requiring their intervention"); Campbell v.
Step/Lind Restaurant Corp., 531 N.Y.S.2d 576, 577 (App.
Div. 1988) (dismissing action against bar to recover
damages for personal injuries suffered after a shooting by
a fellow bar patron, as the nature of the shooting was
"such that it was unforeseeable and could not have been
guarded against"); Kilmetis v. New York Transit Auth., 580
N.Y.S.2d 779, 780 (App. Div. 1992) (affirming dismissal of
complaint against New York City Transit Authority for
failing to provide adequate police protecting, finding that
there was no special relationship between the plaintiff and
defendant giving rise to a duty of care, and even assuming
such a duty, the act of the assailant was unforeseeable).

          Defendant owed a duty of care to Walsh as his
employer and Defendant's contention that its supervision of
Silvestri was not negligent is controverted by record
evidence.  Accordingly, since no genuine issues of material
fact exist, Walsh's motion for summary judgment on his
claim for negligent supervision of Silvestri is granted.

## The Claim Based Upon GML § 205(a) Has Not Been Established

Walsh has asserted a claim under GML § 205-a, based on the City's alleged violation of New York Labor Law § 27-a(3)(a)(1), which establishes safety and health standards for public employees, violation of several Fire Department Regulations prohibiting the use and possession of alcohol upon Fire Department premises, and violation of Fire Department Regulations requiring the immediate reporting of violations of the alcohol policy.

The "firefighter's rule," a common law doctrine long accepted in New York, bars firefighters injured in the line of duty from recovering damages for injuries caused by "negligence in the very situations that create the occasion for their services." Madonna v. Am. Airlines, Inc., 82 F.3d 59, 61 (2d Cir. 1996) (citing Santangelo v. State, 71 N.Y.2d 393, 397 (1988)); see also Giuffrida v. Citibank Corp., 100 N.Y.2d 72, 76-79 (2003).

However, the New York State Legislature enacted General Municipal Law (GML) § 205-a to create a cause of action on behalf of firefighters where none had existed at common law. Martinez v. Fed. Home Loan Mortgage Corp., 943

F. Supp. 280, 285 (S.D.N.Y. 1996) (citing Zanghi v. Niagara Frontier Transp. Comm'n, 85 N.Y.2d 423, 441 (1995)). GML § 205-a imposes liability for the accidental injury or death of any employee of a fire department caused by any person's violation of any federal, state, county, village, town or city government statute, ordinance, rule, order, or other requirement. N.Y. GML § 205-a(1) (Consol. 2008).

In order to state a claim under GML § 205-a, a plaintiff must "(1) identify the statute or ordinance with which the defendant failed to comply; (2) describe the manner in which the [plaintiff] was injured; and (3) set forth those facts from which it can be inferred that the defendant's negligence directly or indirectly caused the harm to the [plaintiff]." Giuffrida, 100 N.Y.2d at 79.

Walsh alleges that the City violated the following New York City Fire Department regulations: Fire Department Regulation—All Unit Circular 202 §§ 4.4, 4.5, 4.6 and 4.8 (prohibiting use and possession of alcohol while on duty or upon Fire Department premises); Fire Department Regulation—All Unit Circular 202 §§ 5.1, 5.2, 5.3, 5.5.1, 5.5.4 and 5.6 (requiring all Fire Department personnel to immediately report violations of alcohol

policy and requiring officers to relieve members from duty
and report alcohol occurrences to department officials);
Fire Department Regulation—All Unit Circular 268A § 2, 3.1
and 3.1.2 (requiring Fire Department officers to
immediately report any misconduct to Fire Department
Inspector General and report any incidents involving
alcohol use and physical altercations to the Department's
Bureau of Investigations and Trials); and Fire Department
Regulations for the Uniform Force § 25.1.5 and 25.4.1
(prohibiting members on duty from indulging in alcoholic
beverages and engaging in altercations).

*Fire Department Regulations*

In Galapo v. City of New York, 95 N.Y.2d 568
(2000), the New York Court of Appeals addressed the issue
of what constitutes a statute, ordinance, or rule which can
serve as the basis for an action under GML 205-e. Section
205-e is analogous to 205-a, as it provides police officers
with the same exception to the common law that Section 205-
a provides to firefighters. Id. at 573. The court,
citing Desmond v. City of New York, 88 N.Y.2d 455, 464
(1996), noted that "as a prerequisite to discovery, a
police officer must demonstrate injury resulting from

negligent noncompliance with a requirement found in a 'well-developed body of law and regulation' that 'imposes clear duties.'" The court held that the New York City Police Department Patrol Guide "is not part of a duly-enacted body of law or regulation" that can form the basis of a Section 205-e action. Galapo, 95 N.Y.2d at 574. See also Williams v. City of New York, 758 N.Y.S.2d 349, 352-53 (App. Div. 2003); Von Ancken v. City of New York, 666 N.Y.S.2d 16, 16-17 (App. Div. 1997).

Similarly, in the instant case, the Fire Department Regulations and All Unit Circulars do not constitute a "well-developed body of law and regulation" upon which Walsh can base a Section 205-a action.

### New York Labor Law § 27-a(3)(a)(1)

Although violations of New York Labor Law § 27-a(3)(a)(1) can serve as a predicate for liability under Section 205-a, the consumption of alcohol in the Firehouse, while a hazard to the public and perhaps to those consuming the alcohol, is not a physical or environmental hazard of the sort addressed by the statute.

Enacted in 1980, Labor Law § 27-a is New York

State's Public Employee Safety and Health Act ("PESHA").

The law is intended "to provide individuals working in the

public sector with the same or greater workplace

protections provided to employees in the private sector"

under the United States Occupational Safety and Health Act

("OSHA"), 29 U.S.C. §§ 651, et seq. (2000). Hartnett v.

New York City Transit Auth., 86 N.Y.2d 438, 442 (1995).

Section 27-a(3)(a)(1) is commonly referred to as the

"general duty clause" of PESHA. See, e.g., New York State

Inspection, Sec. & Law Enforcement Employees v. New York

State Indus. Bd. of Appeals, 481 N.Y.S.2d 884, 885 (App.

Div. 1984).


Like OSHA, Labor Law Section 27-a(3)(a)(1) is

meant to protect employees from "tangible hazards" which

are "physical condition[s] of the workplace," such as toxic

chemicals or fumes, construction perils, demolition debris

or fire hazards. See Oil, Chem. & Atomic Workers Int'l

Union v. Am. Cyanamid Co., 741 F.2d 444, 448-49 (D.C. Cir.

1984) (interpreting the general duty clause of OSHA).[7]

---

[7] In Hartnett, 86 N.Y.2d at 446-47, the New York Court of Appeals held that case law interpreting OSHA is "not binding" in construing PESHA because, unlike OSHA, PESHA applies to State public sector employers. However, it is reasonable to consider this federal case law because, as

31

The statute is not intended, however, to protect
employees from dangers intentionally caused by fellow
employees or third-persons, and New York cases distinguish
between a recognized hazard that is a physical or
environmental hazard and a hazard that results from an
intentional act or decision. For example, in Balsamo v.
City of New York, 733 N.Y.S.2d 431 (App. Div. 2001), the
court found Section 27-a(3) applicable because of the
physical condition at issue in that case, namely the
placement of the computer console in a patrol car. In
contrast, in Sciangula v. City of New York, 673 N.Y.S.2d
454 (App. Div. 1998), the court found that Section 27-a(3)
did not apply to the plaintiff police officer's claim based
on his inappropriate assignment, while recovering from a
previous injury, to supervise prisoners at the Central
Booking facility in Brooklyn, where he was attacked by a
prisoner. Citing Hartnett, 86 N.Y.2d at 438, the court
unanimously held that the case did "not fall within the
ambit" of Labor Law § 27-a(3)(a)(1). Sciangula, 673
N.Y.S.2d at 455. See also Williams, 758 N.Y.S.2d at 352-53
(finding that the practice of detaining prisoners in
proximity to detectives' lockers was not actionable under

the Court acknowledged in Hartnett, PESHA is "based" on OSHA. 86
N.Y.2d at 442.

32

Section 27-a). Similarly, here, the intentional harm
inflicted by Silvestri did not constitute a physical or
tangible hazard within the purview of the Labor Law.

The recent appellate cases relied on by Walsh in
which Labor Law § 27-a(3)(a)(1) was held to be
appropriately invoked, Balsamo and Campbell v. City of New
York, 819 N.Y.S.2d 294 (App. Div. 2006), do not involve
intentional acts of harm inflicted on employees. These
cases are distinguishable by the physical or environmental
hazard they presented.

The consumption of alcohol in the Firehouse,
while a hazard to the public and perhaps to those consuming
the alcohol, was not a physical or environmental hazard of
the sort addressed by Labor Law-a(3)(a)(1). In Balsamo,
the Court found that there was an issue of fact concerning
whether the unpadded center console was a recognized
hazard. In Campbell, an unruly police horse with a history
of erratic behavior was determined to be a recognized
hazard. Here, the City was not on any notice that there
were conflicts in the Firehouse related to drinking. There
is no admissible evidence of any prior incidents in the
Firehouse related to the consumption of alcohol. In the

absence of such notice, there is no recognized hazard, and thus no redress can be provided under Labor Law § 27(a)(3).

*Causation*

Furthermore, Walsh has failed to meet the causation requirement of a Section 205-a action.

In Giuffrida, the New York Court of Appeals discussed the causation element, stating that "to make out a claim under section 205-a, a plaintiff is not required to show the same degree of proximate cause as is required in a common-law negligence action." 100 N.Y.2d at 81 (internal quotation marks and citations omitted). "Rather, the substantial case law that has developed on the subject holds that a plaintiff need only establish a 'practical or reasonable connection' between the statutory or regulatory violation and the claimed injury." Id. (citing Mullen v. Zoebe, Inc., 86 N.Y.2d 135, 140 (1995)); Zanghi, 85 N.Y.2d at 441.

While the danger of having alcoholic beverages upon Fire Department premises and the appropriateness of prohibiting fire department members from consuming alcohol while in uniform, whether on duty or not, is recognized by

the City,[8] and Walsh has clearly established that
proscriptions and prohibitions involving the use and
possession of alcohol were violated, Walsh's GML § 205-a
claim fails in his failure to establish that those
violations were the cause of his injury, even under the
more broad causation standard under the statute.    The
record fails to establish that Silvestri had consumed the
sangria that he was mixing, or any other alcohol, and that
the consumption of alcohol caused the aggression which led
to the assault.  Cf. German-Bey, 703 F.2d at 55 (finding
that "ostensibly peaceable intoxication does not put a
carrier on notice of the possibility of physical danger to
other passengers").

---

[8] The Fire Department's All Unit Circular (A.U.C.) 202, dated February
1, 1996, entitled "Substance Policy: Drugs/Alcohol," specifically
acknowledges this danger, stating in section 2.1 as follows:

> The mission of the New York City Fire Department is to
> protect the lives and property of the citizens of New York
> City.  The efficient performance of this mission demands
> the highest level of mental and physical fitness of
> Department members.  The lives of citizens, employees and
> co-workers are dependent upon the fitness, stamina and
> alertness of firefighters and fire officers.

> Drugs and alcohol alter alertness, judgment, personality,
> physical agility and responses.  Any impairment of the
> member's physical and mental capabilities increases the
> danger of accidents and injuries, not only to the member,
> but to fellow firefighters and to the public.  Accordingly,
> this circular sets forth the Department's policy with
> respect to alcohol and illegal drugs.

Walsh's contention that FDNY supervisors knew of consumption of alcoholic beverages by members of the Firehouse is supported, but the assumption that the intoxication was the cause of confrontational behavior, including physical altercations, has not been established. While drinking of alcohol did take place in the Firehouse, there is no evidence that violent encounters ensued as a result.

In support of his argument regarding causation, Walsh has submitted an affidavit and report from Dr. Genevieve Ames, a qualified medical anthropologist. In Dr. Ames' Affidavit ¶ 14, subparagraph II, she states that "it was foreseeable that tempers would flair and violence would occur." In ¶ 14, subparagraph III, Dr. Ames states that "[f]ailure to follow the FDNY Alcohol Policy was a substantial factor and proximate cause of the violent attack on Firefighter Walsh." She then states that "[i]t was foreseeable that by failing to adhere to its own alcohol policy, violence would occur by the firefighters towards their co-workers." Dr. Ames states in ¶ 14, subparagraph IV that "[c]reating and maintaining a work culture with positive drinking norms was a substantial factor and proximate cause of the violent attack on

Firefighter Walsh. It was foreseeable that the work
environment created by the City of New York at that
particular firehouse would result in the open consumption
of alcohol and the occurrence of violence by firefighters
against their co-workers."

The use of expert testimony "must be carefully
circumscribed to assure that the expert does not usurp
either the role of the trial judge as to the applicable law
or the role of the jury in applying that law to the facts
before it." Pereira v. Cogan, No. 00 Civ. 619 (RWS), 2002
U.S. Dist. LEXIS 13008, at * 8 (S.D.N.Y. July 18, 2002)
(citing United States v. Bilerian, 926 F.2d 1285, 1294 (2d
Cir. 1991); United States v. Scop, 846 F.2d 135, 139-40 (2d
Cir. 1988); Marx & Co. v. Diners' Club, Inc., 405 F. Supp.
1 (S.D.N.Y. 1975)); see also In re Rezullin Prods. Liab.
Litig., 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) (finding
expert report expressing opinions concerning the ethical
duties and obligations of pharmaceutical companies to be
inadmissible). Framing her conclusion in legal terms, Dr.
Ames has not established that her conclusions are based on
reliable studies or data.

None of the case studies and other anecdotal
evidence provided in the report contains a control group
analogous to the workplace of a Fire Department.  Dr. Ames'
research involving military and civilian agencies of the
federal government and a manufacturing plant do not
establish a link between alcohol and violence.  Reference
to case studies should be excluded where they fail to
contain statistically significant data regarding the
causation at hand.  See, e.g., Green v. McAllister Bros.,
Inc., 02 Civ. 7588, 03 Civ. 1482 (FM), 2005 U.S. Dist.
LEXIS 4816, at *51-52 (S.D.N.Y. Mar. 25, 2005) (holding
that expert could not refer to a database or colleagues'
treatment of patients as a basis for his own conclusion
where the database contained no statistically significant
data regarding the causes of plaintiffs' respiratory
problems).  Dr. Ames' report focuses on the impropriety of
"permitting" workplace drinking, but it does not establish
the causative link between such alleged negligence and the
assault.

As Walsh has not established that the violation
of the regulations prohibiting the use of alcohol was the
cause of his injury, he has failed to establish liability
under GML § 205.a.

**Conclusion**

For the reasons set forth above, Walsh's cross-motion for summary judgment is granted in part with respect to his claim of negligent supervision of Silvestri and in all other respects it is denied. The City's cross-motion to dismiss with respect to the negligent supervision of Silvestri claim is denied and is granted with respect to the remaining claims.

Submit judgment on notice.

It is so ordered.

**New York, NY**
**March** $\mathit{18}$ **, 2008**

**ROBERT W. SWEET**
**U.S.D.J**